# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00082-CR

---

**Rian Hoover, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 460TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-DC-21-301182, THE HONORABLE SELENA ALVARENGA, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellant Rian Hoover challenges his conviction for third-degree stalking. *See* Tex. Penal Code § 42.072. In five issues,[1] he contends that: the evidence was insufficient to prove that he had the requisite mental state to commit the offense; his trial counsel's review of discovery, investigation, and presentation of his defense constitutes ineffective assistance; his trial counsel was ineffective for not making specific objections; the trial court abused its discretion by allowing Hoover's motion for new trial to be overruled by operation of law without a hearing; and the trial court abused its discretion by allowing the admission of specific evidence that he contends was more prejudicial than probative. We affirm the trial court's judgment of conviction.

---

[1] We have maintained Hoover's numbering of the issues but will address them out of order in the interest of clarity.

## BACKGROUND

Sarah Guillory testified that she and Hoover were coworkers before they started dating in November 2018. During their relationship, she met and spent time with his young daughter, who was about three at the time. About nine months into the relationship, there was a "general pattern of behavior change" and they "went from being pretty normal, happy, [and] boring, to having arguments" in which he would be "combative," which she testified were triggered by his drinking alcohol. On New Year's Eve 2019, they had a disagreement in which Hoover disclosed a private and upsetting detail to Guillory's teenage son as "a parting shot."[2] In response, Guillory broke up with Hoover, changed the locks on her home, and put his belongings that were in her possession outside for him to pick up, which he did over the next couple days. Hoover testified that Guillory returned only clothes and kept his jewelry box that contained a watch and other items.

Guillory testified that in late January 2020, an incident happened that caused her to restart contact with Hoover out of compassion. She testified that she received a call from the Austin Police Department. The police were performing a wellness check at Hoover's residence. She was told that Hoover was threatening suicide and asked the officers to call her to come speak with him. Guillory testified that the incident caused her to believe that Hoover was experiencing "instability" and led her to be concerned for his and his daughter's welfare. She clarified that although this incident resulted in her having renewed contact with Hoover, which included an intimate encounter, they had not gotten back together. Hoover testified that he never threatened suicide and that he asked the police to call Guillory because, although he had lived and worked in the Austin area for about four years, he did not know anybody else.

---

[2] There was no testimony about what specifically Hoover told Guillory's son.

2

Guillory testified that during the time following the incident and their renewed contact she started to experience fear for her and her son's safety because when she would try to set boundaries with Hoover regarding "privacy, respect, [and] space," he would disregard them by doing things such as calling and showing up to her workplace and her home unannounced after being told not to. Guillory described the wellness check incident as an example of him not respecting her boundaries.

Exhibits were admitted that included screenshots from Guillory's phone of text exchanges and call history between her and Hoover. In a text exchange that occurred in late May 2020, Guillory texted Hoover asking him to leave her alone. He responded with a string of texts including one that stated, "You say f*** you, leave me alone. It's hard when you love someone. But I will as of now." In late June, Hoover texted Guillory to tell her that his daughter thought she was not responding due to contracting COVID-19. Guillory responded that she did have COVID-19 "but [wanted] to be left alone." He told her that he was there for her and asked her to let him know if she needed anything. She responded, "OK." Over the next seven hours, Hoover sent eight unanswered texts that offered assistance. The last text in that set stated, "I know you want to be left alone but I am concerned."

In June 2020, Guillory moved and did not tell Hoover where she was moving. When asked if Hoover played a part in her decision to move, she responded, "Yes. . . . I didn't want him to know where I lived." She testified that she searched for and found a place that was both "secluded" and protected." She explained that she wanted privacy but also wanted neighbors around in case of an emergency. She testified that the house she moved to was located behind another house so that her house and car could not be seen from the street. Hoover testified that Guillory had told him three areas of town that she was considering moving to but

3

admitted she did not give him her new address. Hoover testified that he and Guillory were looking for new places at the same time and discussed moving in together.

Guillory testified that she "stopped responding altogether" to Hoover in mid-July 2020. She testified that during the ensuing year, Hoover made at least 40 calls, left 24 voicemails, and sent over a hundred texts to her. Guillory testified that the screenshots of texts admitted into evidence were only a representation and not the full record of her text history with Hoover. She explained that she had gathered and inventoried the texts, calls, and voicemails from Hoover around the time she went to the police about the situation, which allowed her to know how many there were, but that since then she had lost access to some of them on her phone. When asked why she did not block Hoover's phone number, she testified that at times she did, but that it did not block him from leaving voicemails and that she had to unblock him to clear his voicemails from her notifications. Guillory testified that in addition to calling from his number, Hoover also called from "blocked or private numbers," from his work phone, and from his daughter's phone. Guillory explained that although she would sometimes answer and speak with his daughter and would answer calls from unknown numbers, she would not speak with Hoover if he was the one calling. She testified that this behavior was "unwelcomed," "a nuisance," and "made [her] afraid to answer [her] phone."

Hoover testified that during this time he and Guillory were friends and planning to get back together after a year of getting "back on track" individually. He testified that when she stopped communicating, he was "just cut off" and did not know they were not friends anymore. He denied calling from any blocked or private numbers because he "wanted her to know it was [him]" calling.

4

Guillory testified that in August 2020, Hoover followed her in his car while she was driving home from work—at which Hoover no longer worked. She did not go home when she realized she was being followed. Guillory testified that she called her sister, Rosemary Guillory (Rose), "in case something happened." Guillory testified that Hoover followed her for about ten miles from North to South Austin until she pulled into a Starbucks parking lot after she realized "it didn't seem like he was going to stop following" her. Hoover followed her into the parking lot and pulled up next to her car. They had a conversation from their vehicles before leaving. She testified that she asked him why he was following her and told him to stop. She could not remember the whole conversation. She testified that she was nervous and afraid.

Rose testified that she was on the phone with her sister for about an hour and that she could tell that Guillory was scared. Rose testified that when Guillory stopped at the Starbucks, Rose could hear "a little bit of screaming" and described Guillory as having "that panic type of voice." She explained that she could not remember Hoover's tone of voice but that he was "probably screaming." She also testified that Hoover had an "aggressive" tone. Rose was afraid for her sister's physical safety and stayed on the phone with her sister until she got home safely.

Hoover testified that he recognized Guillory while driving and honked at her and followed her. He testified that he wanted to talk to her because she had Covid the previous month and he was worried. He testified that he did not follow her as far as she had stated, that they had pulled into a more centrally located Starbucks than the one that she described, and that he only followed her for 15 minutes. He testified that if she had not pulled over when she did, he was going to go home. He testified that when they spoke, she was calmed by his calm demeanor and that neither of them were shouting.

5

In October 2020, Guillory changed jobs. Also, around this time, she got a new car. She testified that she was "making [her]self more difficult to find."

In late-May 2021, Guillory's teenage son told her that he thought he saw Hoover in a van in their neighborhood. Guillory's son was walking from their home to his nearby workplace and was wearing a logo shirt for his work. Guillory testified that Hoover did not live in her neighborhood and lived about 5 or 6 miles away. Hoover denied that it was him in the van.

A few days later, Hoover went to Guillory's house with his daughter and knocked on the door. He testified that he lived only one-and-a-half miles away and that while taking his daughter to a park in the area he recognized her car "parked out front." He testified that while driving by Guillory's house on the way home, he asked his daughter if she wanted to see Guillory, and after his daughter said yes, they stopped to visit.

Guillory testified that she "freaked out" when Hoover knocked on her door. When she opened the door, Hoover was off to the side about ten feet, and his daughter was standing in front of the door. Guillory spoke with Hoover's daughter inside her house for about five or ten minutes while Hoover waited outside. When she went back outside with the child, Hoover attempted to talk to her about having a relationship, and Guillory told him it was not the time or place to do that. Hoover and his daughter left. Guillory was frightened by Hoover showing up at her home unannounced when she did not know he knew where she lived. She testified that she feared for her and her son's safety. In response to his visit, she purchased her first firearm and took a class on how to use it, had a security system and cameras installed at her home, and called the police. About two weeks later, Detective Daniel Doyle contacted her to get

6

more information.  In mid-June 2021, he told her he was going to deliver a cease and desist to Hoover and to report any additional contact from Hoover right away.

Detective Doyle testified that on June 14, 2021, he called Hoover and informed him that Guillory was accusing him of harassing behavior and issued him a verbal cease and desist, which articulated "do not have any contact with her or her family."  Detective Doyle testified that when he makes these kinds of calls, he reads from a generic form, which "outlines to not have any contact via e-mail, text message, snail mail, anything whatsoever . . . directly or through family or friends."  Detective Doyle also sent an email the same day, which stated, "The victim has asked that you stop communication with her and her family and is restating that request in this letter."

The next day, Hoover sent a long Facebook message to Guillory's sister Rose.  In the message, Hoover stated that when he went to Guillory's house with his daughter that Guillory was "startled and then angry, like [he] figured."  His message also mentioned the cease and desist.  Rose told Guillory about the Facebook message, and Guillory updated the police.  Rose testified that Guillory was scared when told about the message.  Hoover testified that he did not read the email until after he sent the Facebook message and that the verbal cease and desist did not include Guillory's family members, only her and her son.  Hoover testified that if he had read the email or if the detective had said "family," then Hoover would not have messaged Rose.  After being informed of the message, Detective Doyle sent Hoover a second email "to remind [him] not to have any contact with Sarah Guillory or any of her family which was clearly stated in the Cease and Desist . . . issued yesterday."

Guillory testified that about two days after the cease and desist, she found a custom-made watch that she had gifted to Hoover while they were dating.  It was left in her

7

driveway, and she testified that it was "destroyed." The glass and one of the clock hands were missing, and there were words carved into the watch and the watchband. She testified that the words were insults he would say to her when they were dating. She testified that it appeared as if the words were carved with a knife. Guillory perceived this as Hoover threatening to harm her with a knife. Hoover testified that he did not leave the watch, and that Guillory had kept the watch when they broke up. Officer Matthew Ligas was assigned to pick up the watch from Guillory and described her demeanor as nervous and scared. He also testified that a person could see her carport if they looked down the driveway.

Guillory testified that later the same day, her son called her from work—a deli that was walking distance from Guillory's home—and told her Hoover was there. Her son seemed alarmed, and she became alarmed and fearful for her son's safety. She called the police and met them at her son's workplace. She saw Hoover sitting in his car in the parking lot when she arrived.

Officer Ligas testified that he was one of the responding officers. Officer Ligas described Hoover as "very defensive" and speaking loudly and rapidly. Officer Ligas testified that Hoover explained the incident of when he visited Guillory at her home with his daughter and told the officer that Guillory had "freaked out because she didn't know that he knew where she lived." Officer Ligas testified that based on the conversation, Hoover was aware that Guillory was not returning his advances or attempts at communication. When Guillory arrived on the scene, Hoover said to the officer, "Hey, she's here. . . . Hey, watch this." Hoover then pointed, smiled, and laughed at Guillory and said, "What's with that look?" Officer Ligas understood Hoover's statement to be "mocking" and "antagonistic" towards Guillory. He testified that Guillory was angry about how long the protective order was taking and expressed concern for

8

her son's physical safety. Based on his conversation with Hoover about why he stayed in the parking lot after he realized Guillory's son worked there, Officer Ligas believed that Hoover was there to make contact with Guillory.

Detective Doyle testified that Hoover was leaving him a voicemail when Officer Ligas arrived at the deli. Detective Doyle explained that he received and checked the voicemail while not on duty because he had expected the situation to escalate. Detective Doyle testified that Hoover explained in the voicemail that he went to a deli where Guillory's son worked, recognized her son, made a purchase, and then went and sat in his car. Detective Doyle testified that based on Officer Ligas's body-cam footage of the incident, Hoover was parked "directly in front of the deli." Detective Doyle testified that Hoover's "overall message" was that "he should be able to eat wherever he wants to eat." Detective Doyle testified that during a later phone conversation, he asked Hoover why he did not leave right away when he realized Guillory's son worked at the deli, and Hoover responded that "he wanted to eat his sandwich while it was still hot instead of leaving."

Hoover testified that he did not know that Guillory's son worked at the deli and was just stopping somewhere to get food on his way home from work. He said he was stunned when he saw Guillory's son working at the deli and did not know what to do so he ordered, waited for his food, took it to-go, and went to his car. Hoover testified that Guillory's son followed him to his car and was recording him with a camera phone. Hoover testified that "it was setup" and that Guillory's son was trying to provoke him because the police were on their way. He explained that he was about to leave when the police arrived, so he called Detective Doyle when he saw a police car. Hoover was not arrested at that time, but an arrest warrant was served on him later that month.

9

Guillory testified that she applied for a protective order for herself and her son. She was granted a temporary ex parte protective order at the end of June 2021. Both Guillory and Hoover testified at a hearing for a final protective order. Guillory and her son were granted a lifetime protective order. Soon after Guillory applied for the protective order, Hoover filed for a protective order against her and sued her for $250,000 in damages in a separate civil case, but Guillory testified that she was unsure what the basis of the suit was. Both were pending at the time of trial.

Hilary Riley, an assistant county attorney with the protective order division, testified about the process of obtaining a protective order. Specifically, she detailed the screening process her office uses to decide whether to file an application on someone's behalf, including a conflicts check, a meeting with a counselor, evidence gathering, preparation of an incidents report, and a review by an attorney. She testified that her office rejects about two-thirds of the requests for assistance based on either a determination that the case will not meet the legal requirements or because a conflict exists. She explained that the burden she has to meet for a protective order is lower than is required in criminal trials. She testified that the cases she deals with are not "your typical, oh, this person is just bothering me and I want them to stay away. Those are cases we reject. Like, yeah, you know, it's kind of annoying or it's a breakup. But our cases rise to a different level. People need to be safe."

Riley testified that she assisted Guillory in obtaining the protective order against Hoover. She agreed when asked if Guillory met all the threshold steps that she had described. Riley testified about admissions that Hoover made at the hearing while testifying after being admonished by the judge regarding his Fifth Amendment rights. Hoover stated that Guillory did not know that he knew "from day one" where she lived because "[y]ou can Google anybody and

10

find out where they live." When describing the time he visited Guillory's home with his daughter, Hoover described Guillory as "startled" and explained that he stayed back away from the door because Guillory is "like a squirrel . . . . Little thing frightens and, you know, runs away." Riley testified that Hoover's testimony made her think that Hoover knew Guillory would be frightened that he was at her home and that he was using his daughter to get to her. Riley testified that the court granted Guillory a lifetime protective order for herself and her son.

Riley testified that she was aware of the protective order application that Hoover filed against Guillory. She explained that although she did not represent Guillory in that proceeding, she alerted the court to the existence of Guillory's lifetime protective order against Hoover. She "felt it was important for the court to know that there was this other proceeding that just recently happened, because it can be a form of retaliation and harassment." She explained that in some cases mutual protective orders are needed but that her office does not handle those. She also explained that sometimes people file "frivolous lawsuits" as a way of getting around a no contact order because communications for legal matters and through attorneys are not covered by protective orders.

Hoover testified that he filed the protective order because "it's [his] Fourteenth Amendment right to have equal protection" and because he wanted protection from her calling the police if she saw him in public. Hoover testified that the transcript from the protective order hearing was a "false document" and a "false transcript." He alleged that it did not match the audio recording of the hearing and that the recording was being withheld from him. On cross-examination, Hoover admitted that at the protective order hearing, at which he represented himself, he never asked Guillory about and never testified about his assertion that they stopped at a closer Starbucks than Guillory had testified. He asserted that he was prevented from doing so

11

by the judge. He testified that his being at the deli within hours of Guillory finding the destroyed watch was a "coincidence" and a "set up."

After hearing all the evidence, the jury found Hoover guilty of stalking. Following a punishment hearing, which included additional testimony from Guillory and Hoover, the trial court sentenced Hoover to five years' imprisonment, suspended for five years. *See generally* Tex. Code Crim. Proc. ch. 42A. Hoover filed a motion for new trial, which was denied by operation of law. *See* Tex. R. App. P. 21.8(c). Hoover appealed.

## SUFFICIENCY OF THE EVIDENCE

In his first issue, Hoover contends that the evidence was insufficient to prove that he had the requisite mental state to have committed the offense of stalking.

### *Standard of Review*

The sufficiency of the evidence is measured by the elements of the offense as defined in a hypothetically correct jury charge, which is "one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). "When addressing a challenge to the sufficiency of the evidence, we consider whether, after viewing all of the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "This standard requires the appellate court to defer 'to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the

12

evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Jackson*, 443 U.S. at 319). "We may not re-weigh the evidence or substitute our judgment for that of the factfinder." *Id.* (citing *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007)). Although factfinders "may not speculate about the meaning of facts or evidence," they are permitted to "draw any reasonable inferences from the facts so long as each inference is supported by the evidence presented at trial." *Id.* (citing *Cary v. State*, 507 S.W.3d 750, 757 (Tex. Crim. App. 2016); *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007)). "We presume that the factfinder resolved any conflicting inferences from the evidence in favor of the verdict, and we defer to that resolution." *Id.* (citing *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012)). This is because the factfinders are "the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony." *Id.* (citing *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010)). "Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.* (citing *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015)).

### *Discussion*

The relevant portions of the Texas Penal Code defining the offense of stalking as of the charged offense date provided:

> A person commits an offense if the person on more than one occasion and pursuant to the same scheme or course of conduct that is directed specifically at another person, knowingly engages in conduct that:

13

(1) . . . that the actor knows or reasonably should know the other person will regard as threatening:

> (A) bodily injury or death for the other person; [or]

> (B) bodily injury or death for a member of the other person's family or household . . .;

(2) causes the other person, [or] a member of the other person's family or household . . . to be placed in fear of bodily injury or death or in fear that an offense will be committed against the other person's property, or to feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended; and

(3) would cause a reasonable person to:

> (A) fear bodily injury or death for himself or herself;

> (B) fear bodily injury or death for a member of the person's family or household . . .;

> (C) fear that an offense will be committed against the person's property; or

> (D) feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended.

Act of January 27, 1997, 75th Leg., R.S., § 1, sec. 42.072, 1997 Tex. Gen. Laws 1, 1 (amended 2011, 2013, 2023) (current version at Tex. Penal Code § 42.072(a)). "A person acts knowingly, or with knowledge . . . when he is aware of the nature of his conduct or that the circumstances exist [or] that his conduct is reasonably certain to cause the result." Tex. Penal Code § 6.03(b).

Regarding the requisite mental state, as charged in this indictment, the State had to establish that on more than one occasion and pursuant to the same scheme or course of conduct, Hoover knowingly engaged in conduct that he knew or should have known Guillory would regard as threatening her or her son with bodily injury or death. As indicted, the State alleged that Hoover committed four acts of threatening behavior directed towards Guillory:

14

sending repeated unwanted electronic messages and making repeated unwanted phone calls to Guillory; following Guillory in his vehicle; going to Guillory's residence; and going to Guillory's son's work and watching him.

Hoover contends that the State failed to prove that he knowingly engaged in conduct that he knew or reasonably should have known Guillory would regard as threatening bodily injury or death to her or her son. Hoover's contention is based on his explanations of the events presented at trial. Hoover contends that he was attempting to rekindle his previous romance with Guillory and that he had no understanding or reason to believe that she would interpret his behavior as threatening.

Here, as described below, the evidence is sufficient to support the jury's finding the requisite mental states for at least two occurrences of threatening conduct—leaving the destroyed watch at Guillory's house and making contact with her son at work. *See id.* § 42.072(a) (requiring showing that person committed harassing or threatening conduct "on more than one occasion and pursuant to the same scheme or course of conduct"). Generally, a culpable mental state must be inferred from the circumstances. *Nisbett v. State*, 552 S.W.3d 244, 267 (Tex. Crim. App. 2018). "Alleged threats should be considered in light of their entire factual context, including the surrounding events and the reaction of the listeners." *Manemann v. State*, 878 S.W.2d 334, 337 (Tex. App.—Austin 1994, pet. ref'd) (considering relationship between defendant charged with telephone harassment and victim when determining evidence was sufficient to support that defendant intentionally made threats).

Viewing the evidence in the light most favorable to the verdict, we conclude that the evidence established the following. After Guillory broke up with Hoover, he threatened suicide and told the responding police officers that he would only speak to Guillory. Then,

15

Guillory attempted to create boundaries with Hoover around communication and not visiting her at work and home when not invited, but he refused to respect those boundaries. Guillory testified that an example of Hoover's disrespect for her boundaries was the wellness-check incident, when he told the police that she was his emergency contact and gave them her contact information after she had ended their relationship. Hoover's disrespect for her boundaries caused Guillory to fear for her and her son's safety. Guillory told Hoover that she wanted to be left alone. Her fear of Hoover motivated Guillory to move without telling him where she was moving and then to completely cut off contact with him about a month after moving. Hoover then responded by Googling Guillory to find out where she lived. He sent repeated unanswered offers to help her recover from being sick, and when she did not respond, he followed her from her work for about ten miles until she pulled into a parking lot where he spoke to her in an aggressive tone. According to Guillory's sister Rose, Guillory was noticeably scared and panicked during this encounter, including while speaking to Hoover in the parking lot.

Then, while Guillory was intentionally creating distance from Hoover and making herself harder to find, she also maintained some contact with Hoover's young daughter, with whom she had developed concern for due to Hoover's instability after the wellness check incident. Hoover attempted to call Guillory from his daughter's phone, but Guillory would not speak to him. Hoover took his daughter to Guillory's home even though he knew—as he admitted in his later message to Rose—that she would be startled and angry. He intentionally stood away from the door leaving his child on the doorstep. After Guillory and Hoover's daughter spoke, which Hoover testified was the reason he went to her home, Hoover then attempted to talk to Guillory himself about restarting their romantic relationship. Guillory testified that she "freaked out" when Hoover knocked on her door and that his visit made her fear

16

for her and her son's safety, which prompted her to obtain a security system and a firearm and to contact the police.

Also, after Guillory cut off contact with Hoover—which she testified occurred after she developed a fear for her and her son's safety due to Hoover's patterns of behavior regarding disrespecting her personal boundaries—he continued to call, text, and leave voicemails that were unwanted and unreciprocated for a year. Hoover also called her from blocked or private numbers, which made Guillory afraid to answer her phone.

Then after Hoover was told by a detective not to have any contact with Guillory or her family, Hoover messaged Guillory's sister. After being sent a follow up email reminding him not to have any contact with Guillory or her family, Hoover went to Guillory's home and left a personally-significant watch in her driveway that he had destroyed and carved insults—that he had said to her when they were dating—into the watchband with a knife. Guillory believed this was a threat to harm her with a knife. We conclude that Hoover leaving the destroyed watch at Guillory's residence is an occurrence of threatening conduct that the evidence sufficiently supports.

Then within hours of leaving the watch, Hoover went to Guillory's son's work and sat in his car directly in front of the deli. Hoover's demeanor caused the responding officer to believe that Hoover was there to have contact with Guillory, who showed up out fear for her son's safety. We conclude that Hoover going to the place of employment of Guillory's son is another occurrence of threatening conduct that the evidence sufficiently supports.

Hoover contends that this evidence is insufficient to support that he had the requisite mental state because he had no reason believe that Guillory would be threatened by his behavior. However, viewing the evidence in the light most favorable to the verdict, a reasonable

17

jury could have inferred that he knew, or reasonably should have known, that leaving the destroyed watch at her house and making contact with her son at work would be regarded as threatening bodily injury or death after having seen her panicked in the parking lot after following her, having seen her startled and angry when he showed up to her home, and receiving a cease and desist from a police detective by phone, email, and follow-up email. *See Vernon v. State*, 571 S.W.3d 814, 820 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd) ("[W]e defer to the jury on questions of witness credibility, and we presume that they resolved any confusion in favor of the verdict"). There is also evidence in the record sufficient to support the jury's finding that Guillory was actually placed in fear of bodily injury or death for herself or her son and that a reasonable person would have been placed in such fear. We conclude that the evidence is sufficient to support Hoover's conviction for the offense of stalking. *See Ploeger v. State*, 189 S.W.3d 799, 811 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (concluding that "the jury rationally could have concluded that the frequency, escalation, content, and unsolicited nature of appellant's conduct, as well as his display of at least some anger when others disagreed with him or prevented his sitting near [the victim], would have caused a reasonable person to fear bodily injury or death for herself"). We overrule his first issue.

**EVIDENTIARY RULINGS**

In his fifth issue, Hoover contends that the trial court erred by admitting evidence that was not relevant and was more prejudicial than probative. Specifically, he complains that the trial court allowed testimony regarding Guillory obtaining a lifetime protective order against Hoover, Hoover filing for a protective order against Guillory, Hoover filing a civil lawsuit against Guillory, and the wellness check incident. The State contends that this issue is not

18

preserved regarding the testimony discussing Hoover's protective order application and civil suit and that the trial court did not err by admitting the testimony regarding the lifetime protective order and the wellness check.

To preserve a complaint for appellate review, there must ordinarily be a timely, specific objection and a ruling by the trial court. Tex. R. App. P. 33.1(a). Appellate courts should not address the merits of an issue that has not been preserved for appellate consideration. *See Blackshear v. State*, 385 S.W.3d 589, 591 (Tex. Crim. App. 2012). Regarding the testimony discussing Hoover's filing of a protective order application and civil suit against Guillory, those complaints are not preserved because there was no objection made to either topic of testimony at trial. Thus, we will not address the merits of those specific complaints. *Id.*

We review a trial court's ruling regarding the admission or exclusion of evidence for an abuse of discretion. *See Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). Under that standard, a trial court's ruling will be deemed an abuse of discretion only if it is so clearly wrong as to lie outside "the zone of reasonable disagreement," *Lopez v. State*, 86 S.W.3d 228, 230 (Tex. Crim. App. 2002), or is "arbitrary or unreasonable," *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005). Moreover, the ruling will be upheld provided that the trial court's decision "is reasonably supported by the record and is correct under any theory of law applicable to the case." *Carrasco v. State*, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005). In addition, an appellate court reviews the trial court's ruling in light of the record before the court "at the time the ruling was made." *Khoshayand v. State*, 179 S.W.3d 779, 784 (Tex. App.—Dallas 2005, no pet.).

Hoover contends that the testimony regarding Guillory's protective order and the wellness check incident was not relevant. "Irrelevant evidence is not admissible." Tex. R. Evid.

19

402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *Id.* R. 401. Evidence that makes an elemental fact either more or less probable is logically relevant. *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). The evidence need not prove a fact itself; it is relevant if the evidence "provides a small nudge toward proving or disproving some fact of consequence." *Henley v. State*, 493 S.W.3d 77, 99 (Tex. Crim. App. 2016). Article 38.371 of the Code of Criminal Procedure provides that when a defendant is prosecuted for an offense against someone that they "had a continuing relationship of a romantic or intimate nature" with, "each party may offer testimony or other evidence of all relevant facts and circumstances that would assist the trier of fact in determining whether the actor committed the offense . . . *including testimony or evidence regarding the nature of the relationship between the actor and the alleged victim*." Tex. Code Crim. Proc. art. 38.371 (emphasis added). Evidence that "contextualizes the nature of the relationship between victim and assailant" and falls within Article 38.371 is relevant. *McDonnell v. State*, 674 S.W.3d 694, 702 (Tex. App.—Houston [1st Dist.] 2023, no pet.).

Here, the testimony regarding the wellness check was relevant to the elements of Guillory's subjective mindset, *see* Tex. Penal Code § 42.072(a)(2), and whether it was objectively reasonable in response to Hoover's actions, *see id.* § 42.072(a)(3). It explained why Guillory reconnected with Hoover after the breakup, why she communicated with him during a time that she testified she was concerned about his "instability" and began to fear for her and her son's safety, and why she continued to communicate with Hoover's daughter after cutting off communication with him. *See Upchurch v. State*, 656 S.W.3d 170, 179 (Tex. App.—Fort Worth 2022, no pet.) (agreeing with State's suggestion that evidence of defendant's conduct can have

20

probative value concerning nature of relationship between defendant and victim, including why victim returned to defendant).

Regarding the lifetime protective order, the testimony was relevant to show that Guillory feared Hoover and took action consistent with her testimony that she feared for her and her son's safety—that is by obtaining a lifetime protective order for her and her son against Hoover. Thus, we conclude that the trial court did not abuse its discretion when it overruled Hoover's relevancy objections to testimony of the wellness check and Guillory's lifetime protective order against him. *See Price v. State*, 245 S.W.3d 532, 539 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (concluding that protective order had "strong probative value . . . in demonstrating the parties' relationship as well as [defendant]'s intent").

Hoover contends that the testimony of Guillory's protective order and the wellness check incident should have been excluded under Rule 403 of the Rules of Evidence. Rule 403 provides that relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. "Under Rule 403, it is presumed that the probative value of relevant evidence exceeds any danger of unfair prejudice. The rule envisions exclusion of evidence only when there is a clear disparity between the degree of prejudice of the offered evidence and its probative value." *Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009) (footnotes and internal quotation marks omitted). Accordingly, "the plain language of Rule 403 does not allow a trial court to exclude otherwise relevant evidence when that evidence is merely prejudicial. Indeed, all evidence against a defendant is, by its very nature, designed to be prejudicial." *Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013) (internal citation omitted). Moreover, reviewing

21

courts should afford trial courts a high level of deference regarding admissibility determinations under Rule 403. *See Brickley v. State*, 623 S.W.3d 68, 79–80 (Tex. App.—Austin 2021, pet. ref'd).

Although not an exhaustive list, courts generally balance the following factors when performing a Rule 403 analysis: "(1) how probative the evidence is; (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence." *Colone v. State*, 573 S.W.3d 249, 266 (Tex. Crim. App. 2019); *see Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). In this context, "probative value" refers to how strongly evidence makes the existence of a "fact of consequence" "more or less probable" and to how much the proponent needs the evidence, and "unfair prejudice" refers to how likely it is that the evidence might result in a decision made on an "improper basis," including "an emotional one." *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010).

In cases like this one, which include an offense against a person the defendant had a dating relationship with, evidence that provides context regarding the relationship between them—including explaining why the victim continues contact with the defendant—is generally considered to have probative value. *See Brickley*, 623 S.W.3d at 81. Here, the testimony about the wellness check explained Guillory's decision to continue contact with the defendant, and the testimony about the lifetime protective order provided context for where the relationship was at the time of trial. *See Upchurch*, 656 S.W.3d at 179; *Price*, 245 S.W.3d at 539. The testimony related to these two events explained Guillory's developing reaction to Hoover's escalating behavior towards her. This factor weighs in favor of admission.

22

We next consider the evidence's potential to impress the jury in some irrational way. Hoover contends that the evidence of Guillory's lifetime protective order against him allowed the jury to convict him at the lower preponderance-of-the-evidence burden of proof required for protective orders rather than requiring that they find him guilty beyond a reasonable doubt. However, the jury heard from Riley that the protective order proceeding was decided at a lower burden of proof than is required in criminal proceedings. Further, the jury was instructed in the charge that the State had the burden to prove each element in this case beyond a reasonable doubt. *Cf. Williams v. State*, 937 S.W.2d 479, 490 (Tex. Crim. App. 1996) (noting that appellate courts assume that jury followed instructions as given); *Walker v. State*, 300 S.W.3d 836, 850 (Tex. App.—Fort Worth 2009, pet. ref'd) (same).

Hoover contends that the testimony regarding the wellness check was used to "capitalize on the jury's sympathies as a distraction from the weaknesses in the State's case." Specifically, he contends—and similarly argued to the trial court—that it allowed the jury to believe that the wellness check was a trap that he used to manipulate Guillory back into a relationship that she did not want to be in when actually the wellness check was initiated by his mother and not him. However, Guillory's testimony about the wellness check never stated that Hoover was the one who called the police, but rather Guillory testified to what the police told her—that he had threatened suicide and gave her name and number as his emergency contact. Although suicide is an emotionally charged topic that could affect the jury, on this record we conclude that this factor weighs neither in favor of nor against admission.

We next consider the time needed to develop the evidence. This factor concerns "whether the jury would be distracted from consideration of the charged offense." *Mechler*, 153 S.W.3d at 441. The time needed to develop the evidence "necessarily includes any

23

testimony introduced regarding the evidence, including cross-examination, redirect examination, and any rebuttal offered by the defense in response to the evidence." *Hart v. State*, 688 S.W.3d 883, 893 (Tex. Crim. App. 2024). Here, the presentation of evidence during the guilt-innocence portion of the trial covered nearly 400 pages and took two days. The testimony regarding the lifetime protective order was developed over about 54 pages. *See Hernandez v. State*, 203 S.W.3d 477, 481 (Tex. App.—Waco 2006, pet. ref'd) (upholding admissibility of evidence over Rule 403 objection that took up 50 pages during a two-day trial). The wellness check testimony was developed over about fifteen pages total. *See Robisheaux v. State*, 483 S.W.3d 205, 221 (Tex. App.—Austin 2016, pet. ref'd) (finding that this factor weighed in favor of admission where evidence regarding extraneous offense came in though one witness, guilt-innocence phase lasted three days, and testimony about extraneous offense "was only eight pages long"). This factor weighs in favor of admission.

Finally, in deciding whether the evidence was needed by the State, we consider whether the proponent had other evidence to establish the fact of consequence, how strong the other evidence was, and whether the "fact of consequence related to an issue that is in dispute." *See Erazo v. State*, 144 S.W.3d 487, 495-96 (Tex. Crim. App. 2004). The State had a strong need for this evidence. Hoover's defense was focused on portraying Guillory as being overly sensitive and overreacting, arguing that her testimony did not make sense, and alleging that she had sent him mixed signals by not communicating clearly about them being broken up including making plans to move in with him and to get back together after a year, according to Hoover. *See Casey v. State*, 215 S.W.3d 870, 883 (Tex. Crim. App. 2007) (noting that evidence can be admitted under Rule 403 to rebut defensive theory concerning victim's actions and mental state). The evidence of the wellness check and obtaining the protective order puts Guillory's actions

24

toward Hoover and her testimony regarding her mental state throughout the relevant period in context. *See Upchurch*, 656 S.W.3d at 179; *Price*, 245 S.W.3d at 539. The wellness check incident was Guillory's motivation for reconnecting with Hoover after the break-up. The lifetime protective order was the only evidence of actions taken by Guillory to protect herself from Hoover after he escalated his behavior by leaving the destroyed watch at her home and showing up to her son's work. *Cf. James v. State*, 623 S.W.3d 533, 548 (Tex. App.—Fort Worth 2021, no pet.) (noting that State's need for evidence was great where there was limited evidence to prove fact at issue). This factor weighs in favor of admission.

Based on the applicable standard of review and considering that three factors weigh in favor of admission, and one is neutral, we cannot conclude that the trial court abused its discretion by overruling Hoover's Rule 403 objections. *See Brickley*, 623 S.W.3d at 83 (upholding trial court's ruling denying Rule 403 objection when majority of factors weighed in favor of admission of evidence). We overrule Hoover's fifth issue.

## INEFFECTIVE ASSISTANCE OF COUNSEL

In his second issue, Hoover contends that his trial counsel's review of discovery, investigation, and presentation of his defense constitutes ineffective assistance. In his third issue, Hoover contends that his trial counsel was ineffective for not making specific objections. Specifically, he contends that trial counsel should have: objected to impermissible hearsay, bolstering, and speculative evidence; made constitutional challenges to the stalking statute; and challenged the indictment.

25

*Standard of review*

To prevail on his claim of ineffective assistance of counsel, Hoover must prove by a preponderance of the evidence that (1) his counsel's performance was deficient and (2) the deficiency prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Hernandez v. State*, 988 S.W.2d 770, 772–74 (Tex. Crim. App. 1999). The review of a trial counsel's representation on an ineffective-assistance challenge is highly deferential to counsel's professional judgment. *Strickland*, 466 U.S. at 689.

To meet the first prong of the *Strickland* test, Hoover must overcome a strong presumption that his counsel's conduct falls within the wide range of reasonably professional assistance. *Id.* "[A]ny allegation of ineffective assistance must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999). Generally, a reviewing court will not speculate about counsel's trial strategy. *Mayhue v. State*, 969 S.W.2d 503, 511 (Tex. App.—Austin 1998, no pet.). When there is an absence of evidence in the record about counsel's reasons for the challenged conduct, we "will not conclude the challenged conduct constituted deficient performance unless the conduct was so outrageous that no competent attorney would have engaged in it." *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001). "A substantial risk of failure accompanies an appellant's claim of ineffective assistance of counsel on direct appeal." *Thompson*, 9 S.W.3d at 813. Generally, the proper avenue for developing the record is in a habeas corpus proceeding or in a motion for new trial hearing. *Jensen v. State*, 66 S.W.3d 528, 542 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd).

*Discovery, investigation, and presentation of defense*

Hoover contends that his trial counsel did not review body-cam footage relevant to this case. Notably, there was no hearing held on Hoover's motion for new trial, and information about trial counsel's investigation and trial strategy is not developed in the record through affidavit or other evidence. Rather, Hoover asserts that "trial counsel revealed his lack of preparation by asking a question he would have known the answer to if he had only watched the body camera videos provided to the defense by the State." Specifically, Hoover contends that the record supports that his trial counsel was unaware of the body-cam footage because trial counsel asked the officer that arrested Hoover where his memory for his testimony was coming from, and the officer answered, "body cam." We are not convinced by Hoover's argument that trial counsel's asking a question of a witness inherently means that counsel does not know the answer to it. Further, it appears from the record that counsel was making a point that the testimony was not coming from the officer's memory of the incident but from his memory of watching the body-cam footage. Hoover also contends that the record demonstrates that his trial counsel did not review the body-cam footage because while asking Officer Ligas about wearing a body cam, counsel stated, "Okay. And I don't know. Did—did all this get recorded, or do you . . ." Hoover interprets this statement to mean his counsel did not know what was on the body-cam footage. However, another reasonable interpretation is that counsel was asking if the entire encounter was on the body cam or if the officer was basing his testimony on anything additional. We do not know what trial counsel's reasoning for asking these questions was. It is not clear from the record. *See Thompson*, 9 S.W.3d at 814. Even if his attorney did not review the footage, Hoover has not shown that he was prejudiced by that inaction because he has not shown how his defense would have been different had the footage been reviewed. *See Ex parte*

*Ramirez*, 280 S.W.3d 848, 854 (Tex. Crim. App. 2007) (noting that to be successful in ineffectiveness challenge asserting trial attorney failed to review recording defendant must show that he was prejudiced by failure to review recording).

Hoover also contends that trial counsel failed to fully investigate the allegations. First, he notes that when he was asked by the trial court if he had discussed the allegations with his attorney, he answered, "To an extent, yes." Hoover contends that this is evidence that his counsel did not have the conversations necessary to develop an effective strategy. Without more development, we are not convinced that Hoover's expressions of dissatisfaction with his attorney—although expressed multiple times throughout trial—is evidence of what counsel's investigation was and why he made the decisions he did. *See Thompson*, 9 S.W.3d at 814.

Hoover gives many examples of things that he contends counsel should have done during his investigation and representation. First, Hoover contends that his trial counsel should have gone to Guillory's house and taken photos to support his contention that her car could be seen from the street, contrary to her testimony. Second, he contends that trial counsel should have requested discovery of Guillory's phone and records and of Hoover's phone records to supplement to screenshots presented at trial. Third, he contends that trial counsel should have obtained a "cell phone expert" to challenge the screenshots presented at trial and to testify about how Guillory's phone stores information and treats blocked numbers. Fourth, Hoover contends counsel should have played the 911 call of his mother calling 911 the day of the wellness check to show that he did not call 911—although there was no testimony that he called 911 that day. Fifth, Hoover contends that his trial counsel should have presented "timecards" from his work to establish that he had an alibi for when the destroyed watch was left at Guillory's home. Finally, although he acknowledges that defense counsel is not required to hire an investigator, he also

28

complains that his defense counsel did not hire one, without stating what benefit the investigator would have provided.

Regarding all the above contentions of ineffective investigation, none of them are supported by the record. Specifically, we do not know whether any of the complained of missing information or evidence would be helpful or hurtful to Hoover's defensive theory or whether trial counsel investigated the above avenues and determined based on trial strategy that that they did not benefit Hoover's defense. *See Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002) (noting that "[i]f a reviewing court can speculate about the existence of further mitigating evidence, then it just as logically might speculate about the existence of further aggravating evidence" and noting that introducing additional mitigating evidence can cause prosecutors to present additional aggravating evidence). Additionally, there is no evidence in the record to show that an expert witness was available to testify and that the testimony would have benefited Hoover. *See Johnston v. State*, 959 S.W.2d 230, 236 (Tex. App.—Dallas 1997, no pet.) (explaining that defendant "may base an ineffective assistance claim on an attorney's failure to present witnesses only if the [defendant] can show that the witnesses were available, and their testimony would have benefitted the defendant"). Hoover's contentions of ineffective assistance counsel regarding discovery, investigation, and presentation of his defense are not firmly rooted in the record. *See Thompson*, 9 S.W.3d at 814; *see also Ex parte Dennis*, 665 S.W.3d 569, 574 (Tex. Crim. App. 2022) (explaining that to succeed on an ineffectiveness challenge "that counsel was ineffective for failing to investigate," defendant "must show what a more in-depth investigation would have shown").

*Objections*

Hoover contends that his trial counsel was ineffective for not making specific objections. Hoover has grouped his complaints by the objection that he asserts should have been made, and we will analyze them according to that grouping as well. The failure to raise a meritless objection is not deficient performance. *See Riles v. State*, 595 S.W.2d 858, 861 (Tex. Crim. App. 1980). Also, "[a]ny error in trial strategy will be deemed inadequate representation only if counsel's actions are without any plausible basis." *Parmer v. State*, 38 S.W.3d 661, 666 (Tex. App.—Austin 2000, pet. ref'd). When "counsel's reasons for his conduct do not appear in the record and there is at least the possibility that the conduct could have been legitimate trial strategy, we will defer to counsel's decisions and deny relief on an ineffective assistance claim on direct appeal." *See Ortiz v. State*, 93 S.W.3d 79, 88–89 (Tex. Crim. App. 2002) (applying this principle to allegation of ineffective assistance for not making specific objection). We note that counsel's reasons for not objecting do not appear in the record.

<u>Hearsay</u>

Hoover contends that his counsel should have objected on hearsay grounds when Guillory testified that her son told her that he thought he saw Hoover in a van by their house and when she and Officer Ligas each testified that Guillory's son told them Hoover was at the deli. Hearsay, a statement made outside of court that is offered for its truth, is generally inadmissible unless an exception applies. *See* Tex. R. Evid. 801, 802. The State contends that trial counsel could have chosen not to object to the complained of testimony because he was strategically choosing to have the evidence be presented this way rather than objecting and risking that the State would call Guillory's son to testify. We agree. Guillory testified that she asked the State not to call her son as a witness because of how hard a time he had with everything that happened

30

with Hoover. She testified that what Hoover said to her son that initiated her breakup with him had very serious and negative mental-health effects on her son. Trial counsel could have strategically determined that Guillory's son would have been a more sympathetic witness and that the information was less damaging coming from other witnesses. *See Ortiz*, 93 S.W.3d at 88–89; *see also id.* at 95 (overruling ineffectiveness claim for failing to object to hearsay where State "might have chosen to introduce the evidence directly" had hearsay objection been made and where "[d]efense counsel might have believed that such direct evidence would have a more powerful and adverse effect on the jury than the evidence the State was content to offer").

### *Lack of personal knowledge*

Hoover contends that multiple witnesses were allowed without objection to testify to matters that they lacked personal knowledge of. Specifically, Hoover complains that Rose was allowed to testify that she did not remember Hoover's tone but that Hoover was "probably screaming" and that she was afraid that Hoover was a danger to her sister. He also complains of the statement that Detective Doyle made explaining why he answered his work phone after hours by stating that he had expected Hoover's behavior to escalate and that it did. Hoover also complains of Riley's testimony that she believed—based on watching Hoover testify at the protective order hearing—that Hoover had used his daughter to get to Guillory because he knew Guillory would be afraid of him.

Rule of Evidence 602 states that a witness may not testify to a matter unless he or she has personal knowledge of the matter. Further, "[a] witness can testify in the form of an opinion under Rule 701 if the opinions or inferences are (a) rationally based on his or her perceptions and (b) helpful to the clear understanding of the testimony or the determination of a fact in issue." *Osbourn v. State*, 92 S.W.3d 531, 535 (Tex. Crim. App. 2002). "Perceptions refer

31

to a witness's interpretation of information acquired through his or her own senses or experiences at the time of the event (i.e., things the witness saw, heard, smelled, touched, felt, or tasted)." *Id.*

All of the complained of testimony was based on the witness's own perceptions. *See Riles*, 595 S.W.2d at 861; *cf. Williams v. State*, 466 S.W.2d 313, 314 (Tex. Crim. App. 1971) (explaining that "[t]he fact that a witness cannot be positive in his identification goes to the weight of the testimony and not to its admissibility"); *Hall v. State*, 640 S.W.3d 333, 344 (Tex. App.—Houston [14th Dist.] 2022, pet. ref'd) (concluding that witness had requisite personal knowledge to testify to "dangerousness" of area where altercation occurred even though witness was not present for altercation when witness testified that he had lived and worked in area for over twenty years). However, even if inadmissible, trial counsel's decision not to object could have been reasonable trial strategy. Hoover contends that this testimony was not admissible based on the content of the testimony rather than the question asked. Trial counsel could have determined that it was better not to draw attention to the testimony or to be able to cross-examine on it or ask Hoover about it. *See Duren v. State*, 87 S.W.3d 719, 734 (Tex. App.—Texarkana 2002, pet. struck). Defense counsel did cross-examine Rose and was able to point out that Guillory had not testified the same as Rose had regarding whether there was screaming. Defense counsel asked Hoover questions that allowed him to explain his perspective of his and Guillory's demeanor in the Starbucks parking lot and to deny Riley's assertion that he had used his daughter to get to Guillory. *See Ortiz*, 93 S.W.3d at 88–89.

*Bolstering*

Hoover contends that Riley's testimony regarding the protective order process was "impermissible bolstering" because Riley testified to the low number of cases that her office

32

accepts, to the seriousness of the cases they do accept, and to the need for matters to proceed quickly because of safety concerns. He contends that Riley's testimony that the law does not prevent frivolous filings and that some people use the legal system to continue to harass victims was an impermissible opinion testimony about the validity of Hoover's legal actions against Guillory. Notably, the Court of Criminal Appeals has explained the concern with the "bolstering" objection because it contains "inherent ambiguity" and is a legal term of art that "failed to survive the adoption of the Rules" of Evidence. *Rivas v. State*, 275 S.W.3d 880, 886 (Tex. Crim. App. 2009). Further, trial counsel objected to admission of testimony about Guillory's protective order outside the presence of the jury. That objection was overruled. *See* Tex. R. Evid. 103 (noting that party need not renew objection if one is made outside presence of jury and evidence is deemed admissible). Even if a bolstering objection would have been proper, it could have been trial counsel's strategy to not emphasize the testimony with additional objections in front of the jury and instead to cross-examine Riley and ask Hoover for his responses, which he did. *See Ortiz*, 93 S.W.3d at 88–89.

### *Relevancy*

Hoover contends that his trial counsel should have objected to statements by Guillory that he contends are not relevant. As discussed above, evidence that makes an elemental fact either more or less probable is logically relevant. *See* Tex. R. Evid. 401; *De La Paz*, 279 S.W.3d at 343.

Hoover complains of Guillory's testimony that she obtained a home security system and a firearm after Hoover visited her home. However, this testimony was presented for the purpose of proving that Hoover's conduct had caused Guillory to be placed in fear, which the State was required to prove. *See* Tex. Penal Code § 42.072(a)(2); *Riles*, 595 S.W.2d at 861.

33

Hoover also complains that Guillory testified that her dog had died the day she found the watch. Guillory testified that she knew the approximate time the watch was left because she was walking back and forth from her house to her driveway to meet with the vets who were there to euthanize her dog and that she would have noticed the watch if it had been there sooner. Hoover contends that this testimony was intended to imply that Hoover knew the dog had died and left the watch at that time to further harass her. However, there was no such express testimony, and Guillory was explaining how she knew when the watch was left. The timing concerning the watch was important since it was placed at Guillory's house only a few hours before Hoover visited Guillory's son's work, which put the threatening nature of that conduct in context. *See Mayes v. State*, 816 S.W.2d 79, 85 (Tex. Crim. App. 1991) (explaining that background evidence that gives context and aids understanding of narrative is type of evidence that may be relevant). Additionally, Guillory testified that after the police picked up the watch from her, she went for a drive to process the loss of her dog. This explained why it took her as long as it did to get to her son's work—not because she was not sincerely afraid for his safety but because she was on a drive clearing her head and no longer at home. *See Riles*, 595 S.W.2d at 861. Additionally, trial counsel could have determined that this testimony was beneficial to his defensive strategy because it gave an alternative reason for Guillory's emotional responses that day that was unrelated to Hoover. *See Ortiz*, 93 S.W.3d at 88–89.

Hoover complains that Guillory testified regarding the impact that Hoover's lawsuit had on her—specifically that she feared people finding the public records containing allegations that she testified were not true. This testimony provided an example of a way that Hoover continued to engage in conduct that caused her "to feel harassed, annoyed, alarmed, abused, tormented, *embarrassed*, or offended," *see* Tex. Penal Code § 42.072(a)(2) (emphasis

34

added), and gave context to the nature of their relationship, *see* Tex. Code Crim. Proc. art. 38.371. *See Riles*, 595 S.W.2d at 861.

Again, there is no evidence on this record regarding trial counsel's strategy regarding the allegedly irrelevant testimony. *See Ortiz*, 93 S.W.3d at 88–89.

### Lack of remorse on punishment

During closing arguments at the punishment hearing, the State made the following argument to the trial court: "As the Court has seen throughout his testimony, he continues, to this day, to blame others and not take one bit of responsibility for any of his actions at all." Hoover contends that this was a comment on his lack of remorse and inappropriate commentary on Hoover's right to silence. In support, Hoover cites a string of Court of Criminal Appeals cases, in which the Court concluded that certain comments regarding the respective defendants' lack of remorse to be impermissible commentary on the defendant's failure to testify. However, none of those cases are relevant to this situation: Hoover did testify at both guilt-innocence and punishment stages. *See Randolph v. State*, 353 S.W.3d 887, 891 (Tex. Crim. App. 2011) (explaining that "a punishment-stage remark on the defendant's failure to accept responsibility may be fair game if the defendant, in his guilt-stage testimony, denied responsibility for his actions or for the crime"). Further, the State did not comment on his lack of remorse but rather his lack of responsibility. *See id.* at 892 (explaining that "remorse and responsibility are two entirely different concepts"). Here, the State was not commenting on Hoover's silence. Rather, the statement was in response to Hoover's testimony during trial. During the punishment hearing Hoover testified that Guillory's protective order affidavit was "90 percent perjury. She's a liar. She's a bold-faced liar and has committed perjury within the court system and everywhere she goes." He also alleged that her allegations of stalking, which he had been found guilty of,

35

had resulted in him being "falsely imprisoned."  We cannot conclude that trial counsel was ineffective for not objecting to the State's argument.  *See Riles*, 595 S.W.2d at 861; *Randolph*, 353 S.W.3d at 891.

### Constitutional challenges

Hoover alleges that trial counsel was ineffective for not challenging the constitutionality—both facially and as-applied—of the stalking statute in light of the United States Supreme Court's holding in *Counterman v. Colorado*.  *See* 600 U.S. 66, 82 (2023) (granting as-applied constitutional challenge).

Although counsel is presumed to have knowledge of legal principles that are neither novel nor unsettled, "we will not find counsel ineffective where the claimed error is based upon unsettled law."  *Ex parte Welch*, 981 S.W.2d 183, 184–85 (Tex. Crim. App. 1998).  Notably, the issue in *Counterman* did not involve a challenge to the statute at issue.  Rather, the Court considered an as-applied constitutional challenge to a Colorado statute that made it unlawful to "[r]epeatedly . . . make[ ] any form of communication with another person" in "a manner that would cause a reasonable person to suffer serious emotional distress and does cause that person . . . to suffer serious emotional distress."  *Counterman*, 600 U.S. at 85 n.1 (Sotomayor, J., concurring) (quoting Colo. Rev. Stat. § 18–3–602(1)(c) (2022)).  The Court held that although "true threats" do not implicate First Amendment protections, prosecutions for true-threat comments still require proof of at least a reckless mental state by the defendant concerning the threatening nature of the statements, and that as-applied to Counterman, the Colorado statute was unconstitutional on First Amendment grounds.

Hoover contends that the holding in *Counterman* rendered the Texas stalking statute unconstitutional both facially and as applied to him. Specifically, Hoover contends that because the harassment statute includes the sending of repeated electronic messages as a form of harassment, *see* Tex. Penal Code § 42.07(a)(7), and the stalking statute incorporates the harassment statute, *see id.* § 42.072(a)(1), that both statutes are facially unconstitutional under *Counterman*. He further argues that because one of the threatening acts he was accused of committing under the stalking statute was sending repeated electronic communications, the stalking statute is unconstitutional as applied to him.

Subsection 42.07(a)(7) is distinguishable from the Colorado statute examined in *Counterman*. *Compare* Tex. Penal Code § 42.07(a)(7), *with Counterman*, 600 U.S. at 85 n.1. Unlike the Colorado statute, which prohibited communications, the Texas harassment and stalking statutes prohibit conduct and acts. The Texas Court of Criminal Appeals has analyzed the distinction between subsection 42.07(a)(7) criminalizing the content of electronic messages—which may be within the protections of the First Amendment—and the act of sending electronic messages—which does not implicate the First Amendment. *Compare Owens v. State*, ___S.W.3d ___, No. PD-0075-24, 2025 WL 1587690, at *9 (Tex. Crim. App. 2025) (concluding that section 42.07(a)(7) was unconstitutional as applied to Owens because of how it was used "prosecuted [him] for the content of his messages" rather than manner or action of sending them), *with Ex parte Sanders*, 663 S.W.3d 197, 201 (Tex. Crim. App. 2022) (holding that Section 42.07(a)(7) of Penal Code prohibits non-speech conduct and thus does not implicate First Amendment's freedom of speech protections), and *Ex parte Barton*, 662 S.W.3d 876, 885 (Tex. Crim. App. 2022) (same).

37

Here, the evidence presented regarding the electronic messages from Hoover focused on their unwanted and persistent nature of the messages, not the messages' content. The content of many of the messages at issue was not shown to the jury. On this record, we cannot conclude that trial counsel was ineffective for not raising a constitutional challenge to the stalking statute. *See Welch*, 981 S.W.2d at 184–85.

### Challenges to the indictment

Hoover contends that his trial counsel should have moved to quash the indictment because it failed to specify which communications were being included in the allegation that he sent repeated electronic communications and because his non-threatening communications were protected by free speech. We understand Hoover to be challenging a portion of the indictment that alleges that one of the threatening acts he knowingly committed was "sending repeated unwanted electronic messages and making repeated unwanted phone calls to [Guillory]." As noted above, there is a distinction between criminalizing the content of communication, which may implicate the First Amendment, and the act of sending electronic messages and phone calls regardless of their content, which does not. *See Owens*, 2025 WL 1587690, at *9; *Sanders*, 663 S.W.3d at 201; *Barton*, 662 S.W.3d at 885. Here, the indictment included sending the unwanted messages and making unwanted phone calls within the specified date range—from June 14, 2020, to the presentment of the indictment—as one of the ways Hoover was alleged to have committed a threatening act. Thus, Hoover was not accused of committing stalking based on the content of non-threatening communications. He was accused of the act of sending unwanted electronic messages. Further, the indictment tracks the language of the statute. *See* Tex. Penal Code § 42.072; *State v. Mays*, 967 S.W.2d 404, 406

(Tex. Crim. App. 1998) (explaining that generally "an indictment tracking the language of the statute will satisfy constitutional and statutory requirements"). Trial counsel's decision to not raise a meritless objection is not deficient performance. *See Riles*, 595 S.W.2d at 861.

### *Conclusion*

The record does not include anything from which we may discern that counsel's performance was not based on sound strategy. On this record, we cannot conclude that the conduct was so outrageous that no competent attorney would have engaged in it. *See Garcia*, 57 S.W.3d at 440. Thus, we conclude that there is insufficient basis in the present record to overcome the presumption that counsel exercised reasonable professional judgment. *See Strickland*, 466 U.S. at 689. Accordingly, we overrule Hoover's second and third issues.

## MOTION FOR NEW TRIAL

In his fourth issue, Hoover contends that the trial court abused its discretion when it allowed his motion for new trial to be denied by operation of law without holding a hearing.

We review the trial court's denial of a motion for a new trial for an abuse of discretion and will reverse only if the ruling is arbitrary or unsupported by any reasonable view of the evidence. *See Najar v. State*, 618 S.W.3d 366, 372 (Tex. Crim. App. 2021). We also review the trial court's denial of a hearing on a motion for new trial for an abuse of discretion. *See Smith v. State*, 286 S.W.3d 333, 339 (Tex. Crim. App. 2009). Thus, we will reverse only when the trial judge's decision was so clearly wrong as to lie outside the zone of reasonable disagreement. *See id.* A defendant does not have an absolute right to a hearing on a motion for new trial. *Reyes v. State*, 849 S.W.2d 812, 815 (Tex. Crim. App. 1993).

Rule of Appellate Procedure 21.6 requires a defendant to timely "present" a motion for new trial to the trial court. "The defendant must put the trial judge on actual notice that he desires the judge to take some action, such as making a ruling or holding a hearing, on his motion for new trial." *Gardner v. State*, 306 S.W.3d 274, 305 (Tex. Crim. App. 2009). "Presentment" must be apparent from the record. *Id.* "[M]erely filing a motion is insufficient" to satisfy the presentment requirement. *Stokes v. State*, 277 S.W.3d 20, 24 (Tex. Crim. App. 2009).

Here, there is nothing in the record that demonstrates that Hoover ever "presented" his motion, much less presented it in a timely manner. The record reflects that appellate counsel filed a motion for new trial and a Certificate of Presentment on January 8, 2024, which included a request for a hearing and an attached proposed order. However, the certificate alone does not satisfy the presentment requirement. *See Colone v. State*, 573 S.W.3d 249, 259 (Tex. Crim. App. 2019) (noting that "the mere filing of a 'certificate of presentment' will not suffice to establish that a motion for new trial and request for a hearing has been presented to the trial court"). Further, the proposed order is not signed by the judge and, thus, also does not establish satisfaction of the presentment requirement. *Cf. Stokes*, 277 S.W.3d at 24 (noting that proposed orders *signed* by judge would be sufficient to show motion was actually presented).

In his reply brief, Hoover contends that presentment occurred at a hearing on January 16, 2024, when the trial court denied his request for a hearing on his motion for new trial. However, the court's docket sheet notes that only a motion to revoke was heard on that day. Hoover's reply brief includes attached exhibits that are not in the record that he contends prove presentment. Without deciding whether his exhibits would satisfy the presentment

requirement if included in the record, we conclude that Hoover has failed to establish that it is "apparent from the record" that he presented his motion for new trial and request for a hearing to the trial court. *See Gardner*, 306 S.W.3d at 305. Thus, we cannot conclude that the trial court abused its discretion in not conducting a hearing on his motion for new trial and allowing it to be denied by operation of law. *See id.* at 306 (holding trial court did not abuse its discretion when defendant did not present motion for new trial to trial court). We overrule his fourth issue.

## CONCLUSION

We affirm the trial court's judgment of conviction.

_____

Gisela D. Triana, Justice

Before Justices Triana, Theofanis, and Crump

Affirmed

Filed:   December 12, 2025

Do Not Publish